## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Larissa LaMay,

                Plaintiff,       Case No. 20-12617

v.                          Judith E. Levy
                                United States District Judge

Michigan State Police, Joseph
Gasper, and Keyonn Whitfield,      Mag. Judge David R. Grand

                Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [21] AND DENYING PLAINTIFF'S MOTION TO SUPPLEMENT RECORD AS MOOT [30, 33]

Plaintiff Larissa LaMay filed this employment discrimination case after she was denied a promotion in February 2020. She alleges that Defendants Michigan State Police ("MSP" or the "Department"), Joseph Gasper, and Keyonn Whitfield discriminated against her because of her race and sexual orientation when she was not selected for the position of Assistant Post Commander ("APC"). Defendants filed a motion for summary judgment on each of Plaintiff's claims. (ECF No. 21.) After the Court held a hearing on Defendants' motion, Plaintiff filed a motion to

supplement the record. (ECF Nos. 30, 33.) For the reasons set forth below, the Court grants Defendants' motion for summary judgment, denies Plaintiff's motion to supplement the record as moot, and dismisses the case with prejudice.

## I. Background

### A. Factual Background

#### i. *Plaintiff's Background*

Plaintiff Larissa LaMay is a white woman who is openly gay and has a wife and two children. She holds an associate's degree and enrolled in the Michigan State Police Academy in 1998. (*See* ECF No. 21-2, PageID.168–169.) As of February 2020, Plaintiff had been with MSP for twenty-two years and was a Detective Sergeant stationed at the Metro North Post within MSP's Second District, which covers southeast Michigan.

#### ii. *Gasper Becomes Director of MSP and Announces Diversity Initiatives*

Defendant Joseph Gasper was appointed to serve as the Director of the Michigan State Police by Governor Gretchen Witmer in January 2019. Prior to his appointment as Director, Colonel Gasper was a Captain with MSP. Plaintiff asserts that shortly after taking office, Gasper

announced that MSP's "number one priority" was "diversity."[1] (*See* ECF No. 16, PageID.83–84; ECF No. 22, PageID.260.) Gasper also allegedly emphasized this priority at MSP's October 8, 2019 "Fall Forum" for command officers. (ECF No. 16, PageID.84; ECF No. 22, PageID.260–261.) According to Plaintiff, Gasper told those present at the Fall Forum that (1) MSP was "way too White, and way too male,"[2] (2) "[h]e was going to diversify all ranks of the MSP,"[3] and (3) that "MSP members should not think of 'Me' but rather of 'Us' if denied a promotion for the sake of diversity."[4] (ECF No. 22, PageID.260–261.) Plaintiff was not present for

---

[1] Gasper denied stating that diversity was the number one priority of MSP. (ECF No. 22-2, PageID.282.) However, Stephanie Horton, MSP's Human Resources Director, testified that she heard Gasper make such a statement. (ECF No. 22-21, PageID.423.)

[2] Gasper did not recall stating that the MSP was "way too white, and way too male" when asked during his deposition. (ECF No. 22-2, PageID.282.) He instead testified: "I could have referenced the obvious appearance of the department being predominantly white, being predominantly male, and our goal, for decades, to be as diverse as we can be, to represent the state of Michigan the best we can." (*Id*.)

[3] Gasper testified only that he was sure he "talked about the importance of diversification of the Department to include . . . all areas." (ECF No. 22-2, PageID.282–283.)

[4] It is not clear if the testimony of former MSP command officers cited in support of this third assertion is supported by admissible evidence in the record. The cited excerpt from Michael Caldwell's deposition does not identify who made the

any of Gasper's comments at the Fall Forum. Nor were any of Gasper's alleged comments about the importance of diversity directed at Plaintiff or the relevant APC hiring process.

Under Gasper, MSP also issued a "Strategic Plan: 2020-2022" in December 2019, which expressly identifies applicant diversity as an objective for the agency. (ECF No. 21-9, PageID.231.) Specifically, the plan indicated that MSP would "[i]nstitute recruiting practices that reduce barriers to employment in order to increase the trooper minority applicant pool and female applicant pool by Dec. 31, 2022." (*Id.*) To measure its performance on this objective, MSP set a target of "25% racial minority trooper applicant pool" and "20% female trooper applicant pool." (*Id.*) The plan does not include any such goals regarding applicant pools for internal promotions.

### iii. *Whitfield is Promoted to Post Commander, Leading to the Open APC Position*

In April 2019, an Inspector position became available in the Second District, reporting to the Captain Thomas Deasy. In May 2019, Joseph

---

relevant statement. (*See* ECF No. 22-16, PageID.398.) And the cited excerpt from Michael McCormick's deposition consists of McCormick reading his own response to a survey about the Fall Forum. (*See* ECF No. 22-22, PageID.426–428.)

Brodeur, a white man and then-Post Commander of Metro North Post in the Second District, was selected for the Inspector role. Following Brodeur's promotion, Defendant Keyonn Whitfield, an African-American man and then-Lieutenant and APC, was selected as Post Commander for Metro North Post and promoted to First Lieutenant.

### iv.   *Whitfield Makes Homophobic Comments Prior to the Hiring Process*

On November 20, 2019, Whitfield held a mandatory Sergeants' meeting for the Metro North Post, which Plaintiff attended. At the meeting, Whitfield made several comments about an openly gay trooper who spoke at the October 2019 Fall Forum. (*See* ECF No. 22-5, PageID.305–306.) Whitfield expressed that he couldn't believe the trooper would come out publicly during the conference, and Whitfield repeatedly exclaimed, "He gay!" (*Id.* at PageID.305; ECF No. 22-12, PageID.353.) Whitfield also stated: "I can't believe that motherf[*****]r was saying that." (ECF No. 22-13, PageID.376–377.) A few of the other Sergeants attempted to steer the conversation away from this subject, but Whitfield returned to it several times. (ECF No. 22-12, PageID.354.)

Whitfield's comments made Plaintiff "very, very uncomfortable." (*Id.* at PageID.353–354.) She eventually reported the incident on or about

April 10, 2020, and an administrative complaint against Whitfield was opened on April 23, 2020. (ECF No. 22-5, PageID.305, 307.) Lieutenant Jennifer Pintar of MSP's Professional Services Section (also referred to as "Internal Affairs" or "IA") investigated Plaintiff's allegations. (*See generally* ECF No. 22-5.) In his interview with Pintar, Whitfield denied saying "he gay" repeatedly or saying he could not believe someone who was gay would come out to a large group. (*Id.* at PageID.324; *see also* ECF No. 22-27, PageID.495.) Whitfield also indicated that he was not aware of Plaintiff's sexual orientation prior to the Internal Affairs investigation. (ECF No. 22-5, PageID.325.) Another Lieutenant from the Metro North Post who attended Whitfield's mandatory meeting, Marcus Trammel, told Pintar that he was not sure Whitfield was aware that Plaintiff is gay. (*Id.* at PageID.318–319.) During Pintar's investigation, Sergeant Michael Zarate and Lieutenant Sarah Krebs, who attended the November 20, 2019 meeting, told Pintar that they had previously heard Whitfield use homophobic slurs at work. (*Id.* at PageID.317, 321; ECF No. 22-3, PageID.294–295; ECF No. 22-4, PageID.298–299.) In his interview with Pintar, Whitfield denied using such slurs or having a bias against gay

employees. (ECF No. 22-5, PageID.325; *see also* ECF No. 22-27, PageID.500–501.)

Deasy reviewed Pintar's investigation and recommended that the complaint be closed as sustained. (ECF No. 22-14, PageID.382–383.) The final disposition report from Internal Affairs concluded that Whitfield "created a hostile work environment" and "engaged in conduct contrary to that expected of a command officer." (*Id.* at PageID.383–384.) Whitfield entered into a settlement agreement related to the disciplinary charges, under which his written reprimand was set aside and modified as a formal counseling memo. (ECF No. 22-15, PageID.387–389; ECF No. 22-9, PageID.345.)

### v. *The Hiring Process for the Metro North Post's APC Position*

On January 9, 2020, the Department posted an opening for the APC position at the Metro North Post. (ECF No. 22-24, PageID.446.) The position was initially open only to individuals seeking a transfer, but no applications were received. (*Id.*) On January 13, 2020, the position was opened to applicants seeking a promotion with a closing date of January 21, 2020. (*Id.*) "Applicants were required to complete an application in NEOGOV, submit a PD-35 [recommendation form] via their chain of

command, submit a resume, and [submit] a cover letter as part of the application process." (*Id.*)

Five individuals timely applied: Plaintiff, Kelly Baines, William Dawson, Carmen Maskey, and Matthew McCaul.[5] (*Id.*) Shortly after applications were closed, Maskey was disqualified under the Department's nepotism policy. (*See id.* at PageID.447–448.) The four remaining candidates, including Plaintiff, were provided to Whitfield for screening. (*Id.* at PageID.448.)

At the time, Baines, an African-American woman, was a Sergeant stationed at Metro North, had more than twenty-one years of experience with MSP, and held a bachelor's degree. (*See* ECF No. 21-5, PageID.198; ECF No. 21-6, PageID.207; ECF No. 22-22, PageID.424.) Dawson was also a Sergeant stationed at Metro North and had more than twenty-

---

[5] While Baines timely submitted her NEOGOV application, she failed to attach her resume as required. (ECF No. 22-24, PageID.446; ECF No. 22-26, PageID.483–484.) Lynn Mears of MSP's Human Resources Division notified Whitfield of this deficiency on January 23, 2020, and indicated it was his decision whether to allow Baines to continue in the hiring process. (ECF No. 22-24, PageID.446.) Whitfield responded to Mears via email: "Please allow her to submit her resume and ultimately attach it to NEOGOV. I believe a lot of members are confused with this new language. I'll be sure to stress this moving forward." (*Id.* at PageID.446–447.) Mears contacted Baines, who submitted her resume in NEOGOV as requested on January 24, 2020. (*Id.* at PageID.447.)

three years of experience with MSP. (*See* ECF No. 21-5, PageID.198; ECF No. 21-10, PageID.235.) McCaul was a Sergeant stationed at the Cadillac Post in MSP's Seventh District in northern Michigan. (*See* ECF No. 21-10, PageID.235.)

Prior to scheduling or conducting interviews, Whitfield met with several applicants to discuss the APC position. On or about January 24, 2020, Whitfield met with Baines at the Metro Nort Post's Chesterfield Detachment.[6] (ECF No. 22-24, PageID.442.) During the meeting, Baines and Whitfield discussed his expectations for the position, the type of skills that he wanted the APC to possess, and whether Baines would be happy in that position.[7] (ECF No. 21-6, PageID.211.) Dawson also met

---

[6] Baines testified that she met with Whitfield before the application period closed and before the interview competencies were announced. (ECF No. 22-26, PageID.484.) However, when asked if it was possible that the conversation took place after she applied, she responded: "Yes. It is possible." (*Id.* at PageID.489.) Whitfield could not recall whether the meeting took place after Baines applied for the APC position. (ECF No. 21-4, PageID.190; *see also* ECF No. 22-24, PageID.464.) The subsequent Internal Affairs investigation concluded that the meeting likely took place on January 24, 2020. (ECF No. 22-24, PageID.442.)

[7] It is unclear if Baines took notes during the meeting. Another Sergeant at the Chesterfield Detachment, Sheila Shields, indicated that she found documents left out on a counter that appeared to be questions and answers for a promotional interview and that they appeared to be in Baines' handwriting. (ECF No. 22-24, PageID.460.) On or about January 27, 2020, Shields informed Plaintiff and McCaul about the notes

with Whitfield briefly when the position was posted but did not meet with him after he was scheduled for an interview. (*See* ECF No. 21-7, PageID.219; ECF No. 22-24, PageID.458.) McCaul indicated that he called Whitfield and left a message but did not hear back.[8] (*See* ECF No. 22-24, PageID.458.) Plaintiff did not attempt to have a conversation with Whitfield regarding the position prior to an interview being scheduled. (*See* ECF No. 21-2, PageID.170–171.)

Baines explained during her deposition that the "department has always trained that it's a good idea, prior to putting in for a position, to meet with the hiring manager, to see what their expectations are for the position, and that was the reason that I wanted to speak with Lieutenant Whitfield." (ECF No. 21-6, PageID.210.) Whitfield confirmed this practice

---

and the questions and answers contained therein. (*Id.* at PageID.444, 460.) Baines testified that she did not take notes during the meeting with Whitfield. (ECF No. 22-26, PageID.482.) However, she explained that she wrote out potential questions and answers as part of her own preparations for the interview. (ECF No. 22-24, PageID.461.) Plaintiff included photographs of Baines' notes with her complaint to Internal Affairs. (*See id.* at PageID.442, 444.) While Baines read from several pages of these notes during her deposition (*see* ECF No. 22-26, PageID.472–480), the notes themselves do not appear to be part of the summary judgment record.

[8] Brodeur reached out to McCaul to discuss promotions and the two "spoke over the phone in general terms about the position and the interview process as he (Inspector Brodeur) was sitting on the interview panel." (ECF No. 22-24, PageID.458.)

was common and noted that it was "open to everyone up until the point where I give out the competencies."[9] (*See* ECF No. 21-4, PageID.190–191.) Boucher and Krebs also confirmed that meeting with a hiring manager prior to interviewing was common practice in the Department. (*See* ECF No. 21-7, PageID.218–219; ECF No. 21-8, PageID.226–227.)

On January 27, 2020, Mears emailed Whitfield with guidance on selecting interview questions for the APC position. (ECF No. 22-24, PageID.448.) Whitfield responded the following day with the proposed interview questions and indicated that the interviews would take place on February 6, 2020 at the Metro North Post. (*Id.* at PageID.448–449.)

On January 29, 2020 at 2:27 p.m., Whitfield emailed Plaintiff, notifying her that she was selected for an interview for the APC position:

Good afternoon,

You have been selected for an interview for the vacant Lieutenant 14 position at the Metro North Post. The competencies for this interview will be:

Specialized Skills and Knowledge
Job Fit

---

[9] With respect to the APC position, these competencies were formally disclosed to the applicants via Whitfield's email notifying them of their selection for an interview. (*See* ECF No. 22-24, PageID.449–451.) Whitfield's email to Plaintiff listing the competencies for the position appears below.

> Planning and Organizing
> Delegating Responsibility
> Decision Making
>
> Your interview will be held at the Metro North Post on Thursday, February 6th at 8am. Please forward me an email acknowledging receipt of this interview date and time.
>
> Thank you and see you then.
>
> F/Lt. Keyonn Whitfield

(ECF No. 21-3, PageID.181–182 (emphasis omitted).) Whitfield also emailed Baines, Dawson, and McCaul with identical messages that varied only in the interview time listed (9:30 a.m., 1:00 p.m., and 11:30 a.m., respectively). (ECF No. 22-24, PageID.449–451.) Baines, Dawson, and McCaul each responded, confirming their interview slots. (*Id.*)

On January 29, 2020 at 5:34 p.m., Plaintiff responded to Whitfield's proposed interview slot:

> F/Lt. Whitfield,
>
> Thank you for the opportunity to interview for the vacant Lieutenant 14 position at the Metro North Post.
>
> I am on a scheduled vacation and out of the country Thursday February 6, 2020. I will return to work Monday February 10, 2020. I am respectfully requesting an alternate date to complete this interview.

Thank you,

Larissa

(ECF No. 21-3, PageID.181.) Plaintiff also spoke with Whitfield about a potential alternative date in person, but he indicated to Plaintiff that rescheduling was unlikely due to an upcoming inspection.[10] (*See* ECF No. 22-12, PageID.363.)

Whitfield consulted with Brodeur regarding Plaintiff's request for an alternative date, and Brodeur in turn consulted with Mears about rescheduling the interview or conducting it by alternative methods such as Skype. (*See* ECF No. 22-24, PageID.454–456, 463.) Mears informed Brodeur that an adjournment or remote interview was at the hiring manager's discretion.[11] (*See id.* at PageID.454–455.)

---

[10] During the subsequent Internal Affairs investigation, Whitfield indicated that the urgency was related to McCormick's transfer out of the Second District to a post in Lansing, Michigan in December 2019. (*See* ECF No. 22-24, PageID.464.) At his deposition, Whitfield testified: "As it relates to urgency, . . . the process does take time and the longer . . . we wait, the longer it takes to fill the position. So past practices for me, I have never delayed or altered an interview day once I set it." (ECF No. 21-4, PageID.193.)

[11] Whitfield testified: "I've never delayed any interviews in the past because someone was on vacation or unable to interview for whatever reason. I've never done that[,] and I've conducted many, many, many hiring interviews or promotional interviews. (*See* ECF No. 21-4, PageID.193.)

Whitfield responded to Plaintiff on January 30, 2020 at 1:06 p.m.:

Good afternoon,

Unfortunately, the interview date will not be adjusted; however, I am extended [sic] you the opportunity to interview via FaceTime or Skype. Please advise if you wish to proceed with the interview via one of the suggested means.

Thanks,

KW

(ECF No. 21-3, PageID.180.)

Plaintiff replied to Whitfield on January 31, 2020 at 2:15 p.m.:

Good Afternoon,

I received your email regarding my interview for the Lieutenant APC position at the post.

I feel the FaceTime or Skype option for an interview puts me at a considerable disadvantage as compared to the other candidates that will have an opportunity for a face to face interview.

As I stated[,] I will be out of the country on a family vacation and my family is my top priority. I want to be completely present and engaged for them; not distracted and unavailable in hopes of maintaining a strong FaceTime/Skype connection in the middle of the Caribbean.

As a highly qualified candidate[,] I am disappointed this process has produced this outcome.

Larissa

(*Id.*) At 2:43 p.m. that same day, Brodeur emailed Deasy, Whitfield, Mears, and Inspector James Smiley (the Second District's other Inspector):

> D/Sgt. Lamay has decided not to interview remotely for the APC position (Skype, FaceTime, etc.). F/Lt. Whitfield extended her that option, and she declined on today's date.

> This brings the candidate pool for the position down to 3.

> Joe

(ECF No. 22-24, PageID.452.)

On February 2, 2020, McCaul emailed Whitfield to withdraw himself from consideration for the promotion. (*Id.* at PageID.452–453.) McCaul told Boucher that "he did not feel he was a good overall fit for the APC position" and that "if F/Lieutenant Whitfield had interest in him he would have received a call back." (*Id.* at PageID.458.)

Sergeant Dawson and Lieutenant Baines were interviewed on February 6, 2020. (*Id.* at PageID.453.) "The PD-11 signed by the members of the interview panel (Inspector Brodeur, Inspector James Grady and F/Lieutenant Keyonn Whitfield) indicates both candidates achieved a score of 42, of a possible 60 points, on the panel interview portion of the

hiring process." (*Id.*; ECF No. 21-5, PageID.197–198.) Both candidates also received a score of 25 out of 30 points on the PD-305A Lieutenant Attachment A-Job Fit Form.[12] (ECF No. 22-24, PageID.453; ECF No. 21-5, PageID.200–201.) These scores were used by Whitfield to create a PD-305 Lieutenant Candidate Comparison Grid. (ECF No. 22-24, PageID.453; ECF No. 21-5, PageID.198.) The Comparison Grid reflects that Baines received 4 points for seniority and 4 points for her bachelor's degree for a total score of 75. (ECF No. 21-5, PageID.198.) Dawson also received 4 points for seniority but received only 2 points for his military service, resulting in a total score of 73. (*Id.*) The Comparison Grid was included with an interview memorandum prepared by Whitfield, which indicated that "Baines [was] the selected candidate." (*Id.* at PageID.196.)

### vi. Investigation into Plaintiff's Allegations of Discrimination

On or about April 27, 2020, Internal Affairs received a complaint from Plaintiff, alleging that she was subjected to discrimination because

---

[12] Plaintiff received an identical score of 25, while McCaul received a score of 26. (ECF No. 22-24, PageID.453; *see also* ECF No. 21-5, PageID.202–203.)

of her race and sexual orientation.[13] (*See* ECF No. 22-24, PageID.442–443.) First Lieutenant Brody Boucher, Commander of MSP's Professional Services Section, conducted the investigation. (*See generally* ECF No. 22-24.) During his investigation, Boucher interviewed Plaintiff, Whitfield, Baines, Dawson, McCaul, Krebs, Trammel, Brodeur, and Shields. He also corresponded with Mears via email and reviewed relevant records and emails. Boucher then prepared a thirty-two-page report.[14]

Deasy reviewed Boucher's investigative report and recommended the case be closed as unfounded. (*See* ECF No. 21-10, PageID.236.) In his comments to Boucher, Deasy stated:

> There appear to be two primary allegations in this complaint. First, that D/Sergeant Lamay was not permitted to interview due to her sexual orientation. Second, that F/Lieutenant Whitfield violated procedure by providing Sergeant Baines interview questions, thereby creating an unfair advantage for her.

> Regarding the first allegation, the investigation yielded no information to support the claim that D/Sergeant Lamay was not interviewed due to her sexual orientation. To the contrary,

---

[13] Plaintiff initiated the complaint via a call with Inspector Lisa Rish, who was MSP's Equity and Inclusion Officer at the time. (ECF No. 22-24, PageID.443.)

[14] Plaintiff provided only twenty-five of the thirty-two pages to the Court. It appears that pages 19 to 25 of the report were omitted. (*See* ECF No. 22-24, PageID.459–460.)

she was offered an interview by F/Lieutenant Whitfield and she made the choice not to interview. The investigation also shows that F/Lieutenant Whitfield did not decide on his own not to offer her a different date to interview. Instead, the decision was largely made for him after he consulted with his supervisor and HR staff, and the decision certainly complied with department procedure and past practice. It also seemed entirely reasonable to not offer a separate date when a virtual interview was possible on the original date. Allowing one applicant extra time to prepare could be an unfair advantage for that applicant, which is what was complained about in the second allegation here.

Regarding the second allegation, the only thing proven was that F/Lieutenant Whitfield and Sergeant Baines had a conversation about the position, which was both appropriate and a wise move by Sergeant Baines. The notes believed by some personnel to be evidence of impropriety actually appear to disprove the allegation because they contain information unrelated to actual questions asked. For example, the first two headings in the notes ("What have I done to prepare for the position" and "Planning/organizing property room") were not questions or topics covered during the interviews. Instead, they appear to be the kind of notes typical of preparation by an applicant.

(*Id.*) Consistent with Deasy's comments, Boucher's Internal Affairs Final Disposition Report recommended that no charges be filed. (*See id.* at PageID.236–237.)

## B.    Procedural History

On September 23, 2020, Plaintiff filed her original complaint against Defendants MSP, Gasper, and Whitfield. (ECF No. 1.) On November 30, 2020, Defendants filed an answer. (ECF No. 8.) On July 1, 2021, Plaintiff filed an amended complaint.[15] (ECF No. 16.) The amended complaint asserts claims for race and sexual orientation discrimination under 42 U.S.C. § 1983, Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), and Title VII of the Civil Rights Act of 1964.[16] (*Id.* at PageID.87–93.) On July 29, 2021, Defendants filed an answer to the amended complaint. (ECF No. 17.)

On November 30, 2021, Defendants filed the present motion for summary judgment on all claims. (ECF No. 21.) Plaintiff responded (ECF No. 22), and Defendants filed a reply. (ECF No. 26.) On June 16, 2022,

---

[15] Plaintiff filed her amended complaint after receiving a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"). (*See* ECF No. 16, PageID.91–92.)

[16] Count I, race discrimination in violation of § 1983, is asserted against Gasper and Whitfield. Count II, sexual orientation discrimination in violation of § 1983, is asserted solely against Whitfield. Count III, race discrimination in violation of the ELCRA, is asserted against all Defendants. Count IV, sexual orientation discrimination in violation of the ELCRA, is asserted against MSP and Whitfield. Counts V and VI, race discrimination and sexual orientation discrimination in violation of Title VII, are asserted solely against MSP.

19

the case was reassigned from the Honorable Stephanie Dawkins Davis to the undersigned. The Court held a hearing on the motion on December 14, 2022 and took the matter under advisement. Plaintiff subsequently filed a motion to supplement the record.[17] (ECF Nos. 30, 33.) Defendants responded (ECF No. 32), and Plaintiff filed a reply. (ECF No. 34.)

## II.   Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

---

[17] Plaintiff originally filed her motion on December 15, 2022. (ECF No. 30.) However, her attached declaration was not signed. (*See* ECF No. 30-1.) Plaintiff filed a corrected version of her motion on December 30, 2022, which included a signed copy of her declaration. (ECF Nos. 33, 33-1.)

## III.  Analysis

To succeed on her claims for race discrimination and for sexual orientation discrimination under § 1983, the ELCRA, and Title VII, Plaintiff must demonstrate that she suffered an adverse employment action. However, as set forth below, Plaintiff cannot make this required showing because the undisputed evidence establishes that she withdrew her application for the APC position. For this reason, the Court grants summary judgment to Defendants on each of Plaintiff's claims.

### A. Section 1983 Claims

In Counts I and II of her amended complaint, Plaintiff asserts claims under § 1983 for violations of her right to equal protection under the Fourteenth Amendment of the United States Constitution. Specifically, Count I alleges that Whitfield and Gasper discriminated against her on the basis of race by failing to promote her to APC. Count II alleges that Whitfield discriminated against her because of her sexual orientation.

"To state a claim for [a] violation of 42 U.S.C. § 1983, the plaintiff must demonstrate that: (1) a person (2) acting under color of state law, (3) deprived [her] of a federal right." *Sutherland v. Mich. Dep't of*

*Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (citation omitted); *Weberg v.*

*Franks*, 229 F.3d 514, 522 (6th Cir. 2000). A plaintiff asserting a § 1983

claim "against a public employer for an equal protection violation . . .

must show that the employer made an adverse employment decision

'with a discriminatory intent and purpose.'" *Sutherland*, 344 F.3d at 614

(quoting *Boger v. Wayne Cnty.*, 950 F.2d 316, 324–25 (6th Cir. 1991)).

"The plaintiff must establish that the employment decision at issue

would not have been made 'but for' the plaintiff's race [or sexual

orientation], which is to say [s]he must prove that 'discriminatory intent

more likely than not was the basis of the adverse employment action.'"

*See Toth v. City of Toledo*, 480 F. App'x 827, 832 (6th Cir. 2012) (citations

omitted).

    "Because both Title VII and § 1983 prohibit discriminatory

employment practices by public employers, [the Sixth Circuit] looks to

Title VII disparate treatment cases for assistance in analyzing race [or

sexual orientation] discrimination in the public employment context

under § 1983." *See Weberg*, 229 F.3d at 522 (citations omitted). As with

claims under Title VII, a § 1983 plaintiff can meet her evidentiary burden

through either direct or circumstantial evidence.[18] *Id.* at 522–23. However, whether a plaintiff proceeds based on direct or circumstantial evidence, she must first establish that she suffered an adverse employment action. *See Sutherland*, 344 F.3d at 614; *Weberg*, 229 F.3d at 522; *see also Crane v. Mary Free Bed Rehab. Hosp.*, 634 F. App'x 518, 522 (6th Cir. 2015) (explaining that a plaintiff relying on direct evidence to establish a Title VII claim must still identify an adverse employment action).

### i. *Plaintiff Cannot Establish an Adverse Employment Action Because She Withdrew Her Application*

"In the context of a Title VII discrimination claim, an adverse employment action is defined as a 'materially adverse change in the terms or conditions' of employment." *Laster v. City of Kalamazoo*, 746

---

[18] "Direct evidence 'is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Weberg*, 229 F.3d at 522 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). "Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus." *Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, 502 F. App'x 523, 534 (6th Cir. 2012). If a plaintiff lacks direct evidence of employment discrimination, she may meet her evidentiary burden through indirect or circumstantial evidence under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Weberg*, 229 F.3d at 523.

F.3d 714, 727 (6th Cir. 2014) (quoting *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). "An adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (internal quotations omitted) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Additionally, an "adverse employment action 'requires an official act of the enterprise, a company act.'" *Id.* (quoting *Burlington Indus*, 524 U.S. at 762).

To establish an adverse employment action based on failure to promote, "the plaintiff must be (1) a member of a protected class; (2) who applied for and was qualified for a promotion; (3) who was considered for and denied a promotion; and (4) other similarly qualified employees who were not members of the protected class were given promotions." *Watson v. City of Cleveland*, 202 F. App'x 844, 854–55 (6th Cir. 2006) (citing *Allen v. Mich. Dep't. of Corrections*, 165 F.3d 405, 410 (6th Cir.1999)); *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000).

In this case, Plaintiff claims that she suffered an adverse employment action when she was denied a promotion to APC in February

2020. Consistent with this position, Plaintiff testified in her deposition that she "never withdrew" her application for the APC position and insisted that she merely "declined having a Skype or a Face[T]ime interview." (ECF No. 22-12, PageID.368–369.) But in her January 31, 2020 email to Whitfield declining his offer for a remote interview, Plaintiff stated: "As a highly qualified candidate[,] I am disappointed this process has produced *this outcome*." (ECF No. 21-3, PageID.180 (emphasis added).) Plaintiff later conceded at her deposition that this email "effectively was a refusal to interview." (ECF No. 22-12, PageID.369.) Moreover, Plaintiff points to no evidence that she took any action related to the APC position after sending this response to Whitfield until she initiated her Internal Affairs complaint in April 2020. For these reasons, the Court finds that Plaintiff withdrew her application for the APC position and therefore cannot establish an adverse employment action.[19]

---

[19] In her response brief, Plaintiff asserts that Whitfield's refusal to reschedule the interview for February 10, 2020 was itself an adverse employment action. (*See* ECF No. 22, PageID.270 ("The denial of the interview was a discriminatory adverse action in and of itself.").) However, at the hearing, Plaintiff's counsel conceded that the only adverse employment action alleged in the amended complaint and at issue in this case is Defendants' failure to promote Plaintiff to APC. (*Cf.* ECF No. 16, PageID.87–93.)

### ii.   Plaintiff Fails to Demonstrate that Her Application Was Futile

Plaintiff asserts that, regardless of whether she withdrew her application, she "was not required to pursue a futile interview at the expense of her family." (ECF No. 22, PageID.270.) In *McCormick v. Gasper*, a recent case also involving alleged employment discrimination at MSP,[20] the Sixth Circuit addressed the limited exceptions to the application requirement for a claim based on failure to promote:

> The Sixth Circuit recognizes a few limited exceptions to the requirement that a plaintiff show they applied for a position, including in instances where an employer does not provide a formal mechanism for applying for a promotion. *See Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 576 (6th Cir. 2004) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000)). Another exception to the application requirement is when the plaintiff presents "overwhelming evidence of pervasive discrimination in all aspects of [the employer's] internal employment practices, and [that] . . . any application would have been futile and perhaps foolhardy." *Bacon*, 370

---

[20] In August 2020, Michael McCormick, a white man and a Lieutenant with MSP, sued Gasper and MSP in the Western District of Michigan, alleging race discrimination, gender discrimination, and retaliation. *See McCormick v. Gasper*, No. 22-1033, 2022 WL 16586621, at *1, *3. (6th Cir. Nov. 1, 2022). McCormick's claims related to MSP's failure to promote him to Post Commander of the Metro North Post, a position that eventually went to Whitfield. *See id.* at *1–2. Like Plaintiff, McCormick withdrew his application before interviewing for the position. *See id.* at *2. The district court granted summary judgment to the defendants on all of McCormick's claims, and the Sixth Circuit affirmed. *See id.* at *3, 11. Counsel for Plaintiff in this case also served as counsel to the plaintiff in *McCormick*.

F.3d at 576 (quoting *Harless v. Duck*, 619 F.2d 611, 617–18 (6th Cir. 1980)).

. . . .

In *Harless*, this Court determined that female troopers who were class action members were excused from demonstrating that they had applied for promotions where they had put forward "overwhelming" evidence of discrimination, including facially discriminatory policies as well as statistical evidence that made it "abundantly clear that the discriminatory policies in hiring, classification, assignment, and promotion were grounded on impermissible and archaic traditional stereotypes." [*Harless*, 619 F.2d] at 617. In more recent cases, isolated incidents involving discrimination by a single manager were not sufficient to demonstrate "pervasive discrimination." *See Bolden* [*v. Lowes Home Ctrs., LLC*], 783 F. App'x [589,] 596 [(6th Cir. 2019)]. Furthermore, the exception does not apply where a plaintiff's supervisor offers to help the applicant and or where members of the same class as the plaintiff have been promoted. *See Bacon*, 370 F.3d at 576.

*McCormick v. Gasper*, No. 22-1033, 2022 WL 16586621, at *6–7 (6th Cir. Nov. 1, 2022) (first, second, and third alterations in original) (emphasis omitted).

Here, MSP provided a detailed formal process for applying for the APC position. (*See* ECF No. 22-24, PageID.446–447.) As a result, the first exception identified above does not apply. Plaintiff must therefore present overwhelming evidence of pervasive discrimination which

demonstrates that her application was futile in order for her to proceed on her § 1983 claims based on race and sexual orientation discrimination. *See Bacon*, 370 F.3d at 576.

In her response, Plaintiff does not identify such evidence with respect to her sexual orientation discrimination claim against Whitfield. (ECF No. 22, PageID.276–277.) Nevertheless, the Court views the available evidence in the light most favorable to Plaintiff. *See Pure Tech Sys.*, 95 F. App'x at 135. In doing so, the Court finds that the only relevant evidence in the record is Whitfield's alleged homophobic remarks at the Sergeants' meeting and his history of making other disparaging comments regarding gay people, particularly gay men. (*See* ECF No. 22-5, PageID.305–307, 313, 317, 321.) However, as the Sixth Circuit stated in *McCormick*, "isolated incidents involving discrimination by a single manager [are] not sufficient to demonstrate 'pervasive discrimination.'" 2022 WL 16586621, at *7; *see also Bolden*, 783 F. App'x at 596 (concluding that a manager's statement that the plaintiff could not hold a management job due to his inability to work Saturdays because of his religion was not evidence of pervasive discrimination). As such, Plaintiff has not put forward overwhelming evidence of pervasive discrimination

based on sexual orientation that would excuse her failure to proceed with a remote interview.

Plaintiff also fails to present overwhelming evidence of pervasive discrimination with respect to her claim for race discrimination. In her response, Plaintiff relies on the testimony of William Sands, a former Lieutenant Colonel with MSP, and the declaration of Michael Caldwell, a former Captain with MSP.[21] (ECF No. 22, PageID.270.) Sands testified that he had heard from another officer that Horton had prepared a list of minority and female candidates eligible for promotion to Lieutenant Colonel in the future. (ECF No. 22-17, PageID.401–405.) In his

---

[21] In May 2020, Caldwell, a white man, sued MSP and Gasper in the Western District of Michigan, alleging race discrimination, gender discrimination, and retaliation. *See Caldwell v. Gasper*, No. 22-1031, 2022 WL 16629161, at *1, *5 (6th Cir. Nov. 1, 2022), *cert. denied*, 143 S. Ct. 2433 (2023). Caldwell's case was considered alongside another employment discrimination case brought by Robert Hahn, a white man and former Inspector in the Seventh District who reported to Caldwell. *See id.* at *1 & n.2. In his case, Hahn also asserted claims for race discrimination, gender discrimination, and retaliation against MSP and Gasper. *See id.* at *1, *5. Hahn's and Caldwell's claims stemmed from their mishandling of the hiring process for an APC position in the Seventh District, resulting in Hahn's termination and Caldwell's demotion to Inspector in March 2020. *See id.* at *2–5. The district court rejected Hahn's and Caldwell's claims. *See Hahn v. Gasper*, No. 1:20-CV-403, 2021 WL 9666846, *8–17 (W.D. Mich. Dec. 27, 2021). Hahn and Caldwell appealed only with respect to their retaliation claims, and the Sixth Circuit affirmed. *See Caldwell*, 2022 WL 16629161, at *5, 10. Counsel for Plaintiff in this case also served as counsel to Caldwell and Hahn.

declaration, Caldwell stated: "In the last four years, I am unaware of any minority candidates who qualified and applied for promotion that were not selected for promotion unless there were multiple minority candidates vying for the same position." (ECF No. 22-30, PageID.528–529.) This evidence does little to move the needle in Plaintiff's favor. In *McCormick*, the Sixth Circuit considered the very same testimony from Sands and Caldwell that Plaintiff cites here.[22] *See McCormick*, 2022 WL 16586621, at *7–8. The *McCormick* court determined that this testimony did not constitute overwhelming evidence of pervasive discrimination, finding:

> Taken as true, the testimony of Lt. Colonel Sands . . . does not indicate that the MSP engaged in unlawful discrimination against white police officers; only that Defendants promoted diverse employees to leadership positions once they met certain qualifications.

> Additionally, Captain Caldwell's testimony merely narrates his personal belief—based in part on rumors or allegations he heard from others—that the MSP had failed to promote

---

[22] The portions of Sands' deposition transcript attached as an exhibit to Plaintiff's response (ECF No. 22-17, PageID.401–405) appear to be identical to the transcripts relied on by the plaintiff in *McCormick*. *See* Deposition of William Sands 08/31/2021, *McCormick v. Gasper*, No. 1:20-cv-00779-RJJ-RSK (W.D. Mich. Oct. 28, 2021), ECF No. 70-13. And the copy of Caldwell's declaration filed in this case includes the case caption and ECF header from the district court proceeding in *McCormick*. (ECF No. 22-30, PageID.527.)

qualified white males as part of long-standing discriminatory policies that had been "going on for three decades" but had ramped up in "2018, 2019, and long before then." While sworn testimony can support a motion to defeat summary judgment, it must contain more than "conclusory allegations and naked conclusions of law." *Sigmon v. Appalachian Coal Properties, Inc.*, 400 F. App'x 43, 49 (6th Cir. 2010) (determining that affidavit that offered nothing more than "conclusory allegations and bald conclusions of law" did not create genuine issue of material fact).

*Id.* at *7 (citation omitted). Nothing in Plaintiff's response or in the record suggests that the Court should reach a different conclusion in this case.

In addition to the testimony of Sands and Caldwell, Plaintiff points to Gasper's alleged statements regarding diversity at the Fall Forum and to MSP's efforts to diversify the trooper applicant pool. (*See* ECF No. 22, PageID.260–261, 270.) But Gasper's desire to increase MSP's diversity does not constitute evidence of animus or discriminatory practices against MSP's white employees. *Cf. Johnson*, 502 F. App'x at 535 ("[S]tatements reflecting a desire to improve diversity do not equate to direct evidence of unlawful discrimination."). Plaintiff also appears to rely on a supposed attempt by Gasper to intervene in hiring decisions in

the Second District to increase diversity in its leadership.[23] (*See* ECF No. 22, PageID.262, 270.) However, Plaintiff fails to point to any admissible evidence that supports her conclusory assertions regarding this alleged scheme.[24] Even if Plaintiff could identify admissible evidence to support her assertions, the "overwhelming evidence" exception to the application requirement would not apply to Plaintiff's race discrimination claim because MSP regularly promotes white employees. *See McCormick*, 2022 WL 16586621, at *7 (explaining that "the exception does not apply . . .

---

[23] According to Plaintiff, when the Inspector position in the Second District became available in April 2019, Gasper sought to fill the position through the lateral transfer of an African-American man, Inspector James Grady. (*See* ECF No. 22, PageID.262.) However, Deasy had concerns about the transfer (ECF No. 22-19, PageID.418; ECF No. 22-10, PageID.346), and Grady did not want the job anyway. (ECF No. 22-19, PageID.421.) Brodeur, a white man, was eventually selected for the Second District Inspector position. (*See* ECF No. 22-19, PageID.417.) Plaintiff asserts that "[t]o satisfy Gasper's clamor for diversity, Deasy and Brodeur promoted Whitfield to post commander over [an] eminently more qualified White male candidate, Michael McCormick." (ECF No. 22, PageID.262.)

[24] Deasy and Gasper's then-Chief of Staff, Major Greg Zarotney, both testified that there was no agreement to promote Whitfield to Post Commander in exchange for promoting Brodeur to Inspector. (*See* ECF No. 21-12, PageID.243; ECF No. 22-19, PageID.417.) While Sergeant Aaron Weinrick appears to have testified that he heard "rumors" about the promotion, Plaintiff fails to provide the full context of his testimony on the subject. (*See* ECF No. 22-11, PageID.348–349.) Even if Plaintiff had provided this context, the Sixth Circuit already determined in *McCormick* that Weinrick's "testimony is hearsay because it recounts rumors spread by others offered to prove the existence of a quid pro quo" and that "none of the hearsay exceptions apply." 2022 WL 16586621, at *6.

where members of the same class as the plaintiff have been promoted");
*see also id.* at *8 ("The post commander position that McCormick applied
for was made available due to the promotion of Brodeur, a white male.");
*Hahn*, 2021 WL 9666846, at *7 (noting that both Caldwell and Hahn were
replaced by white men). As such, Plaintiff has not provided overwhelming
evidence of pervasive discrimination against white employees that would
excuse her failure to proceed with a remote interview.

Finally, Plaintiff argues in her response that "[e]mployees can also
prove futility when other evidence demonstrates that an application
would be futile." (ECF No. 22, PageID.271.) However, Plaintiff fails to
identify any Sixth Circuit cases that support her argument that "other
evidence" can demonstrate futility. While Plaintiff does point to one in-
Circuit district court case, that court emphasized that the plaintiff did
not need to demonstrate pervasive discrimination when she "was directly
informed that, <u>due to her disability</u>, she would not qualify for the
position." *EEOC v. Graceworks Lutheran Servs.*, No. 3:15-CV-261, 2016
WL 3387310, at *4–5 (S.D. Ohio June 15, 2016) (emphasis in original).

The Court need not resolve whether futility based on "other
evidence" can excuse Plaintiff's refusal to proceed via a remote interview

because Plaintiff fails to make such a showing of futility here. In her response, the only "other evidence" Plaintiff identifies is her own testimony that "Lieutenant Trammel told me that on several occasions, that First Lieutenant Whitfield had indicated that he was going to give the position to, at that time, Sergeant Ba[i]nes."[25] (ECF No. 22-12, PageID.371.) But this is inadmissible hearsay evidence, which cannot be used to defeat Defendant's summary judgment motion. *Lucas v. Chance*, 121 F. App'x 77, 79 (6th Cir. 2005) ("[O]therwise inadmissible hearsay evidence may not be used to support or oppose a motion for summary judgment." (citations omitted)); *see also* Fed. R. Evid. 801(c) (defining hearsay). Instead, the only admissible evidence related to Whitfield's purported preselection of Baines is Trammel's testimony denying that Whitfield made any such statements to him. (*See* ECF No. 26-5, PageID.592–595.) Thus, Plaintiff fails to establish that her application for the APC position was futile based on "other evidence."

As set forth above, Plaintiff has not shown that she suffered an adverse employment action because she withdrew her application when

---

[25] Plaintiff also testified: "I did not think I would get the promotion. I thought it was already predetermined that Sergeant Ba[i]nes would get it." (ECF No. 22-12, PageID.373.)

she refused to proceed with the remote interview. And Plaintiff has not put forward overwhelming evidence of pervasive discrimination that excuses her failure to complete the application process. Therefore, Plaintiff cannot prevail on her § 1983 claims for discrimination based on Defendants' failure to promote her to APC. Accordingly, the Court grants summary judgment to Defendants on Counts I and II.

### B.   ELCRA Claims

In Counts III and IV of her amended complaint, Plaintiff asserts claims for race discrimination under the ELCRA against all three Defendants and for sexual orientation discrimination under the ELCRA against MSP and Whitfield. Specifically, Count III asserts that Plaintiff's race "was at least a factor, if not the only factor" in Defendants' decision not to promote Plaintiff to the APC position. (ECF No. 16, PageID.89.) Likewise, Count IV asserts that "Plaintiff's sexual orientation was at least a factor, if not the only factor" in Defendants' failure to promote her to APC. (*Id.* at PageID.90.)

Under the ELCRA, an employer may not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege

of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a). As with Title VII, an ELCRA plaintiff may prove her discrimination claim under the ELCRA by either direct or circumstantial evidence. *See Hazle v. Ford Motor Co.*, 464 Mich. 456, 461–63 (2001); *In re Rodriguez*, 487 F.3d 1001, 1007–08 (6th Cir. 2007). Likewise, an ELCRA plaintiff proceeding based on either direct or circumstantial evidence must demonstrate that they suffered an adverse employment action. *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 133–35 (2003). Consistent with Title VII, Michigan courts define an adverse employment action as "akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Chen v. Wayne State Univ.*, 284 Mich. App. 172, 202 (2009) (citations and internal quotations omitted). In the context of a failure to promote claim, an ELCRA plaintiff must show that "(1) she belongs to a protected class; (2) she applied for and was qualified for the position; (3) she was considered for and denied the position despite her qualifications;

and (4) an individual of similar qualifications who was not a member of the protected class received the promotion." *Russell v. Three Pillars*, No. 21-1481, 2022 WL 351770, at *5 (6th Cir. Feb. 7, 2022) (quoting *Crane*, 634 F. App'x at 524).

As with her § 1983 claims, Plaintiff cannot prevail on her claims under the ELCRA because she has not shown she suffered an adverse employment action. Instead, the record demonstrates that Plaintiff withdrew her application for the APC position and that she failed to satisfy any exception to the application requirement. Accordingly, the Court grants Defendants' motion for summary judgement with respect to Counts III and IV.

### C.   Title VII Mixed-Motive Claims

In Counts V and VI of her amended complaint, Plaintiff alleges that MSP violated Title VII because her race and sexual orientation were at least a factor in MSP's failure to promote her to APC. In her amended complaint, Plaintiff requests that these Title VII claims be analyzed as mixed-motive claims. (ECF No. 16, PageID.91–93.)

"A mixed-motive analysis applies to cases 'where an adverse employment decision was the product of a mixture of legitimate and

illegitimate motives.'" *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003)). "A plaintiff triggers mixed-motive analysis by giving notice of bringing such claims." *Id.* (citations omitted).

> [T]o survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) "race, color, religion, sex, or national origin was a motivating factor" for the defendant's adverse employment action.

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (citations omitted). These requirements apply to mixed-motive claims regardless of whether the plaintiff relies on direct or circumstantial evidence of discrimination. *Id.* Moreover, the standard for an adverse employment action in a mixed-motive Title VII case is the same as a traditional, single-motive Title VII case. *See id.* at 402 (citing *Burlington Indus.*, 524 U.S. at 761).

As with her claims under § 1983 and the ELCRA, Plaintiff cannot succeed on her Title VII mixed-motive claims because she cannot establish that she suffered an adverse employment action. As set forth above, Plaintiff withdrew her application for the APC and has not

provided "overwhelming evidence of pervasive discrimination" that would excuse her failure to apply. Accordingly, the Court grants summary judgment to Defendants on Counts V and VI.

### D.   Plaintiff's Motion to Supplement the Record

At the hearing on Defendants' motion, the Court questioned whether there was any evidence in the record that Whitfield knew Plaintiff was gay prior to her April 2020 complaints about Whitfield's conduct to Internal Affairs. After the hearing, Plaintiff filed a motion to supplement the record with declarations from Plaintiff and Zarate related to this issue.[26] (ECF Nos. 30, 33.) Defendants filed a response, arguing that Plaintiff and Zarate's declarations are conclusory, speculative, and contain inadmissible hearsay. (ECF No. 32, PageID.654–661.) Defendants also contend that Plaintiff's declaration is inadmissible under the "sham affidavit" doctrine. (*Id.* at PageID.661–664.) Plaintiff filed a reply brief, asserting that the declarations are

---

[26] As noted above, Plaintiff's declaration attached to her initial motion was unsigned. (*See* ECF Nos. 30, 30-1.) Plaintiff subsequently filed a corrected motion, which included a signed copy of her declaration dated December 20, 2021. (*See* ECF Nos. 33, 33-1.)

admissible and that the sham affidavit doctrine does not apply. (ECF No. 34, PageID.725–729.)

The Court need not resolve whether these declarations are admissible or whether the sham affidavit doctrine applies to Plaintiff's declaration. As set forth above, Plaintiff did not suffer an adverse employment action because she withdrew her application and did not show that her application was futile. Whitfield's knowledge of Plaintiff's sexual orientation has no bearing on the Court's analysis of this issue, and Plaintiff and Zarate's declarations do nothing to alter the Court's conclusion that Plaintiff cannot proceed on any of her claims. Accordingly, the Court denies Plaintiff's motion as moot.

## IV.   Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. (ECF No. 21.)

Plaintiff's motion to supplement the record is DENIED AS MOOT. (ECF Nos. 30, 33.)

The case is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Dated: July 25, 2023               s/Judith E. Levy
Ann Arbor, Michigan           JUDITH E. LEVY
                              United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 25, 2023.

                              s/William Barkholz
                              WILLIAM BARKHOLZ
                              Case Manager